COURT OF APPEALS
DECISION
DATED AND FILED

December 27, 2024

Samuel A. Christensen
Clerk of Court of Appeals

**NOTICE**

This opinion is subject to further editing. If published, the official version will appear in the bound volume of the Official Reports.

A party may file with the Supreme Court a petition to review an adverse decision by the Court of Appeals. *See* WIS. STAT. § 808.10 and RULE 809.62.

Appeal No. **2024AP493**

Cir. Ct. No. **2023GN74**

STATE OF WISCONSIN

IN COURT OF APPEALS
DISTRICT IV

IN THE MATTER OF THE GUARDIANSHIP
AND PROTECTIVE PLACEMENT OF A.S.:

DANE COUNTY,

   PETITIONER-RESPONDENT,

 V.

A. S.,

   RESPONDENT-APPELLANT.

APPEAL from orders of the circuit court for Dane County: SUSAN M. CRAWFORD, Judge. *Affirmed*.

Before Kloppenburg, P.J., Blanchard, and Graham, JJ.

**Per curiam opinions may not be cited in any court of this state as precedent or authority, except for the limited purposes specified in WIS. STAT. RULE 809.23(3).**

¶1 PER CURIAM. A.S. appeals two orders that were entered following a contested hearing: an order that appointed a permanent guardian over A.S.'s person and estate, and an order for protective placement. She argues that the circuit court erred in admitting into evidence a report that had been prepared by her treating physician pursuant to WIS. STAT. § 54.36(1).[1] We reject A.S.'s argument and affirm the guardianship and protective placement orders.

## BACKGROUND

¶2 A.S. was hospitalized in May 2023 for lower back pain and failure to thrive. A.S. had been hospitalized for similar issues on multiple prior occasions and, during this hospitalization, concerns were raised about the care she was receiving at home and her ability to take care of herself.

¶3 An attorney for the hospital filed a petition for temporary and permanent guardianship and a petition for protective placement. In the guardianship petition, the hospital alleged that A.S. had a degenerative brain disorder that resulted in her incapacity to make informed decisions regarding her care, custody, and financial affairs. The hospital further alleged that a neighbor, who was serving as A.S.'s activated power of attorney for health care, recently passed away. According to the hospital, a temporary guardian was necessary because A.S. was medically ready for discharge but, without a health care power of attorney in place, there was no one with the authority to admit her to an

---

[1] All references to the Wisconsin Statutes are to the 2021-22 version.

appropriate facility.[2]   The hospital also sought the appointment of a permanent guardian, and it nominated an agent to act as guardian of A.S.'s person and estate.

¶4     Along with the petitions, the hospital filed a form document titled "Examining Physician's or Psychologist's Report."   *See* WIS. STAT. § 54.36(1) ("Whenever it is proposed to appoint a guardian on the ground that a proposed ward allegedly has incompetency …, a physician or psychologist, or both, shall examine the proposed ward and furnish a written report stating the physician or psychologist's professional opinion regarding the presence and likely duration of any medical or other condition causing the proposed ward to have incapacity …."). The report was filled out by Maryam Zamanian, M.D., who was A.S.'s physician during this and a prior hospital stay. Throughout this opinion, we refer to the report that Zamanian provided as the "examining physician's report" and, occasionally, as the "report."[3]

¶5     A.S. objected to the appointment of a permanent guardian and to any order for protective placement, and a public defender was appointed to represent her.

¶6     The circuit court held a final hearing in September 2023 to address the hospital's requests for a permanent guardian and protective placement.  As petitioner, the hospital had the burden to prove (among other things) that, because

---

[2]  The circuit court appointed a temporary guardian following a June 2023 hearing.  A.S. does not challenge that decision on appeal.

[3]  Additionally, the Dane County Department of Human Services filed a comprehensive evaluation that was authored by a county social worker and recommended that A.S. be placed under guardianship and protective placement.  *See* WIS. STAT. § 55.11.  That evaluation is not at issue here, and we discuss it no further.

of a "degenerative brain disorder," A.S. was "unable effectively to receive and evaluate information or to make or communicate decisions to such an extent that [she was] unable to meet the essential requirements for … her physical health and safety." *See* WIS. STAT. §§ 54.01 (defining "impairment" to include a degenerative brain disorder); 54.10(3)(a) (setting forth legal requirements for a WIS. STAT. ch. 54 incompetency determination); *see also* WIS JI—CIVIL 7060; ***R.S. v. Milwaukee County***, 162 Wis. 2d 197, 203, 470 N.W.2d 260 (1991) (addressing the "components" of an incompetency determination).

¶7      To meet this burden, the hospital presented expert medical testimony from Dr. Zamanian, as well as testimony from a county social worker, and it offered the examining physician's report into evidence. According to the report, A.S. had "dementia, likely Alzheimer's," and her dementia resulted in incapacity because she "lack[ed] insight into [the] level [of her] other needs [and] medical conditions." In her testimony, Zamanian expanded on the reasons for concluding that the diagnosis was appropriate and the effect that it had on A.S.'s ability to care for herself. Most significantly, Zamanian testified that A.S. had been prescribed preventative medications to manage significant respiratory and vascular disease, and that the impairment of her memory, which was caused by dementia, resulted in her not taking medications as directed, which caused her underlying health issues to exacerbate.[4]

¶8      A.S. objected to the admission of the examining physician's report. In so doing, A.S. expressly stipulated to Zamanian's background and

---

[4] A.S. does not dispute that dementia is a degenerative brain disorder for purposes of WIS. STAT. § 54.01(6) and (14), and that its condition is permanent or likely to be permanent.

4

qualifications as a physician. However, she argued that the report was inadmissible because Zamanian had merely acted as a "conduit" for the medical opinions of another physician, contrary to **Walworth County v. Therese B.**, 2003 WI App 223, 267 Wis. 2d 310, 671 N.W.2d 377. Counsel acknowledged that her objection was not based on "the face of the report itself," but that it was based on "outside evidence," which the circuit court allowed counsel to present. After considering the evidence and arguments, the court admitted the examining physician's report into evidence. We discuss Zamanian's testimony, A.S.'s objection, and the circuit court's rationale for admitting the report at greater length in the discussion below.

¶9 Ultimately, the circuit court granted the hospital's petitions. It found that A.S. was impaired as the result of a degenerative brain disorder, and that her need for assistance in decision-making or communication was unable to be met effectively and less restrictively through other means that A.S. would accept.

## DISCUSSION

¶10 On appeal, A.S. challenges the circuit court's decision to admit the examining physician's report into evidence during the contested guardianship proceeding. We review a court's decision to admit evidence for erroneous exercise of discretion. **Allsop Venture Partners III v. Murphy Desmond SC**, 2023 WI 43, ¶23, 407 Wis. 2d 387, 991 N.W.2d 320. "As long as the circuit court 'examined the relevant facts, applied a proper legal standard and, using a

demonstrated rational process, reached a reasonable conclusion,' we will not disturb its ruling." *Id.* (citation omitted).[5]

¶11    As stated, WIS. STAT. § 54.36(1) addresses the report that must be furnished by an examining physician or psychologist in the course of a guardianship proceeding.[6]  As relevant here, § 54.36(1) provides that "a physician … shall examine the proposed ward and furnish a written report stating the physician's … professional opinion regarding the presence and likely duration of any medical or other condition causing the proposed ward to have incapacity."  It further provides that, "[p]rior to the examination on which the report is based," the proposed ward should be informed that any statements they make "may be used as a basis for a finding of incompetency," and that the proposed ward "has a right to refuse to participate in the examination, absent a court order, or speak to the physician." *See* § 54.36(1).

¶12    We turn to two Wisconsin cases, *R.S.*, 162 Wis. 2d 197, and *Therese B.*, 267 Wis. 2d 310, that interpret and apply these statutory provisions.

¶13    In *R.S.*, our supreme court determined that a report furnished under a prior version of the statute was hearsay, and that it was not admissible in a contested guardianship proceeding without the testimony of the examining professional who furnished the report.  *R.S.*, 162 Wis. 2d at 204-07.  The court

---

[5] Although A.S. does not make any separate argument that pertains to the petition for protective placement, we understand that, if we were to reverse the guardianship order, it might follow that the protective placement order would also be reversed.  *See* WIS. STAT. § 55.075(3).

[6] For convenience, we follow the lead of other courts in sometimes referring to a physician or psychologist who furnishes a report under WIS. STAT. § 54.36(1) as an "examining professional."

further interpreted the statute as providing that, in a contested guardianship proceeding, the petitioner is required to present medical testimony by the examining professional, and the proposed ward has the right to cross-examine that professional. *Id.* at 209. As the court explained, the examining professional "ha[s] to be qualified to give a medical … opinion on, for example, a diagnosis of the proposed ward's mental disorder or disability," and also on "whether the proposed ward's inability to care for [their own self was] caused by the mental condition alleged in the petition" rather than by "a physical disability." *Id.* at 209 n.10. The court concluded its discussion by remarking: "We do not believe that in a contested guardianship proceeding, a petitioner could carry the burden of proof without in-person testimony from the examining psychologist or physician." *Id.* at 210.

¶14 Then, in ***Therese B.***, we considered a situation in which the proposed ward exercised her right to remain silent during the examination. ***Therese B.***, 267 Wis. 2d 310, ¶¶4, 6. In that case, because Therese refused to cooperate with the examination, the examining psychologist reviewed reports by other medical professionals who had previously examined her, and then relied at least in part on those reports when he rendered an opinion of Therese's diagnosis and the effect it had on her ability to care for herself. *Id.*, ¶4. Therese argued that the psychologist's report and testimony were inadmissible because the opinions were based on the hearsay opinions of other medical professionals, and that she had been deprived of the statutory right to cross-examine those other professionals. *Id.*; *see also* WIS. STAT. § 54.42(2) ("The proposed ward … has the right to present and cross-examine witnesses, including any physician or licensed psychologist who reports to the court concerning the proposed ward.").

7

¶15     We concluded that the examining psychologist's report and testimony were admissible, and that Therese had not been deprived of her statutory right to cross-examine the professional on whose medical opinion the proposed guardianship was based. *Therese B.*, 267 Wis. 2d 310, ¶¶19-20. In so doing, we explained that it was "well settled" that a physician may properly diagnose a patient "based in part upon medical evidence of which [the physician] has no personal knowledge but which [the physician] gleaned from the reports of others." *Id.*, ¶8 (citing *Karl v. Employers Ins. of Wausau*, 78 Wis. 2d 284, 299, 254 N.W.2d 255 (1977)). We identified two caveats to this rule. First, although a physician can rely on hearsay when forming a medical opinion, and although the physician's opinion may itself be admissible in those circumstances, that does not transform underlying hearsay into admissible evidence. *Id.* Second, an expert cannot be used "solely as a conduit for the hearsay opinions of others." *Id.*, ¶9.

¶16     It is this second caveat that is most significant in A.S.'s case. As we explained in *Therese B.*, the problem with allowing an examining professional "to be nothing more than a conduit for the opinions of others," *id.*, is that the proposed ward would be denied a meaningful opportunity to cross-examine the person who rendered the medical opinion on which the guardianship is based, *id.*, ¶13. An examining professional may rely on information, including the opinions of other doctors, that the professional would normally rely on when rendering an opinion on whether a proposed ward is in need of guardianship. *Id.*, ¶19. However, "[d]ue process" requires that the examining professional do more than merely "summarize" or "regurgitat[e]" the opinions reached by other professionals—the examining professional must "independently confirm[] the facts those opinions are based upon," and must "reach an independent opinion only after a disinterested review of all relevant records." *Id.*, ¶¶1, 18.

¶17    Applying that standard, the ***Therese B.*** court determined that there was no due process violation in that case because the record established that, "in stating his professional opinion," the examining psychologist "was not regurgitating the opinions of other professionals." ***Id.***, ¶20.  Instead, the record demonstrated that the examining psychologist "stat[ed] an independent opinion based upon the medical observations and findings of others, as well as his own observations and findings, information which he normally relies upon in his daily practice." ***Id.***

¶18    We turn to the report and testimony at issue in this case.  Here, it is undisputed that Dr. Zamanian is a physician who is qualified to render a medical opinion about A.S.'s diagnosis and capacity.  It is likewise undisputed that Zamanian examined A.S., and further, that Zamanian had personal knowledge of A.S.'s presentation and affect, her symptoms, and some aspects of her medical history.  Indeed, A.S. was Zamanian's patient during the hospital stay that prompted the hospital's guardianship petition, Zamanian met with A.S. on at least 12 different days during that stay, and Zamanian had also provided care to A.S. during a prior hospital admission in April 2023.

¶19    It is also undisputed that Zamanian relied in part on her consultation with another doctor, Dr. Elizabeth Chapman, who worked in an area that Zamanian referred to as "geriatric" services.  More specifically, during her cross-examination, Zamanian acknowledged that she had sought a consultation from Chapman, who conducted an "Acute Care for Elders (ACE) Initial Assessment." Zamanian further acknowledged that, as part of Chapman's evaluation, Chapman provided "recommendations" on how geriatric services would answer the questions on the examining physician's report.  A.S.'s counsel provided a copy of the assessment, in which Chapman identified certain boxes that should be checked

and certain information that should be provided on the form document that would become the report. Zamanian agreed that the answers she gave on her report "match up" with the answers that Chapman recommended, and that at least some of the answers she gave were "word-for-word" the same as what Chapman recommended.[7]

¶20 The circuit court gave the hospital's attorney an opportunity to redirect Zamanian, and Zamanian provided the following additional testimony about her examination of A.S. and her consultation with Chapman. It was not "unusual" for Zamanian to refer a patient to another doctor for a second opinion, or to ask another physician to do an "Acute Care for Elders" assessment. Zamanian referred A.S. to Chapman because Zamanian wanted additional information. Although Zamanian had been "influenced by the geriatric evaluation," Zamanian testified that she authored the examining physician's report and the conclusions she documented in the report were her own:

> Q. … Did you in fact author the report—the Examining Physician's Report?
>
> A. I wrote it, yes.
>
> Q. And does it contain your own conclusions and opinions?
>
> A. Yes. I would say that they were likely somewhat influenced by the geriatric evaluation, but I verified everything as much as I could with the medical records

---

[7] On appeal, A.S. asserts that "Dr. Chapman instructed Dr. Zamanian as to how to fill out her report, and Dr. Zamanian followed these directions 'word for word.'" This assertion is an overstatement that is not fully supported by a review of the underlying documents. Although a number of the answers that Zamanian gave matched Chapman's recommendations "word for word," there are places in which Zamanian provided explanations in her examining physician's report that went beyond Chapman's recommendations and provided additional details and explanations that Chapman had not included in her recommendations.

from what they have as well and didn't put anything that I didn't agree with.

Q. As well as your own interactions with [A.S.] --

A. Yes.

Q. -- and your own observations, correct?

A. Yes.

¶21 A.S. argued that the examining physician's report should be excluded because, counsel argued, Zamanian had "adopt[ed] the directives of another physician" who was not testifying at the hearing. Counsel argued that the fact that Zamanian's opinion "happens to correspond [with Chapman's opinion] is not the point," and that the evidence suggested that here, "[t]he examination was done by Dr. Chapman and then transcribed by Dr. Zamanian."

¶22 The circuit court overruled the objection. In so doing, it commented that A.S.'s characterization of how the examining physician's report was created was "not what the witness testified to." The court appeared to credit Zamanian's testimony about how the examining physician's report was created and, based on that testimony, the court determined that Zamanian had not simply acted as a "conduit" for Chapman's opinions—instead, the court determined that the report reflected Zamanian's own opinions. The court explained its ruling as follows:

> [Dr. Zamanian] did testify that she did conduct her own evaluation of [A.S.], reviewed the medical records, did request the consult. It was appropriate for her to review the consulting physician's information. Dr. Zamanian did testify that the conclusions in her report are her own.
>
> The points that you raised, [A.S.'s counsel], I think are—go to the weight of the report. And it's fair argument … on your part to argue that she was influenced by Dr. Chapman's findings, but that's not a basis for me not to admit her report.

¶23 On this record, we conclude that the circuit court did not erroneously exercise its discretion in admitting the examining physician's report. Considering the testimony at the hearing and the content of the report, the court could reasonably determine that Zamanian conducted an "independent evaluation" of A.S. and that, as A.S.'s physician, Zamanian had ample opportunity to confirm any facts that Chapman relied on in reaching her opinion. *See Therese B.*, 267 Wis. 2d 310, ¶18. Although A.S. argues that "Zamanian did not form her own opinions," the circuit court made a contrary finding, and A.S. does not show that it was erroneous. It was within the court's discretion to credit Zamanian's testimony that the opinions she put in the report, while "influenced" by Chapman's assessment, were Zamanian's own opinions. Therefore, the court reasonably concluded that Zamanian had not simply "regurgitated" or acted as a mere "conduit" for Chapman's opinion.

¶24 Indeed, the testimony that Zamanian provided throughout the hearing supports the conclusion that her medical opinion—that A.S. had a degenerative brain disorder that caused her to be unable to care for herself—was based at least in part on Zamanian's own interactions with A.S. and her observation of A.S.'s symptoms. As to the diagnosis, Zamanian testified that "dementia requires loss in certain cognitive domains," and that "the big one" in which A.S. "shows the most impairment" was "her memory," which is a "major hallmark[]" of dementia. Zamanian testified: "Often when I meet with [A.S.], she's unable to recall events or recent conversations in the short-term period," and that she had also been "unable" to give "longer-term historical information, including her educational history, her age, [and] her date of birth." Zamanian testified that, "after review of the records," "meeting with [A.S.]," and "talking to my geriatric colleagues, we felt comfortable giving [A.S.] the diagnosis of

12

dementia because her symptoms have been persistent" and "progressive over time," and the doctors had not "identified any reversible cause." Zamanian also explained her reasons for concluding that A.S.'s dementia caused her to be unable to care for herself, and these reasons were based on Zamanian's interview and interactions with A.S. Specifically, that A.S. was reliant on several medications to prevent her respiratory illness and vascular disease from worsening, but that during Zamanian's interview of A.S., A.S. was "not really able to … name her medications" or to "remember when she's gotten her medications." Zamanian testified to specific conversations she had in which A.S. reported that she had already taken medication that Zamanian knew that A.S. had not taken and vice versa, and to her concern that A.S. "doesn't really demonstrate an insight into the connection between receiving these … medications and … [the stability of her] medical conditions." Zamanian's testimony, which was based on her interactions with A.S., lends further support to the circuit court's determination that Zamanian did not act as a mere "conduit."

¶25     Finally, A.S. argues that this is unlike the situation in ***Therese B.***, 267 Wis. 2d 310, because the examining physician's report is a "legal form," not a "medical report or treatment record," and there was no showing that it was "common" for Zamanian to rely on recommendations of others when filling out such legal forms. We disagree. Although the form is promulgated by the Wisconsin Judicial Conference for use in court proceedings, *see* WIS. STAT. § 758.18, the purpose of the form is to document an examining professional's medical opinion about her patient's diagnosis and its symptoms and effects. *See* ***R.S.***, 162 Wis. 2d at 210 n.10 (a witness in a contested guardianship proceeding is giving a medical or psychological opinion regarding diagnosis and causation). Zamanian expressly testified that it is "part of a regular process" to consult with

other physicians and to rely on "collateral sources as part of the evaluative process."[8]

## CONCLUSION

¶26 For all the reasons explained above, we conclude that the circuit court did not erroneously exercise its discretion in admitting the examining physician's report under WIS. STAT. § 54.36(1), and we affirm the guardianship and protective placement orders.

*By the Court.—*Orders affirmed.

This opinion will not be published. *See* WIS. STAT. RULE 809.23(1)(b)5.

---

[8] A.S. makes a separate argument on appeal that she did not make during the circuit court proceedings. She argues that, although the examining physician's report reflects that Dr. Zamanian warned A.S. that she had a right to refuse to participate in the examination or speak to Zamanian, the hospital did not prove that A.S. had received that warning before Dr. Chapman conducted her assessment. We reject this argument for at least the following reasons. First, A.S. forfeited this argument in the circuit court proceedings, and the reasons for applying the forfeiture rule are especially strong here. *See Gruber v. Village of North Fond du Lac*, 2003 WI App 217, ¶27, 267 Wis. 2d 368, 671 N.W.2d 69 (application of the forfeiture rule may be especially warranted where a forfeited argument could have been rebutted with factual information). Second, even if the statute required the warnings to be given before Chapman conducted her assessment—and we do not reach a conclusion on that legal issue here—A.S. does not develop any argument about what the appropriate remedy would be under these circumstances. *See State v. Pettit*, 171 Wis. 2d 627, 646-47, 492 N.W.2d 633 (Ct. App. 1992) (We need not consider arguments that are unsupported by adequate factual and legal citations or are otherwise undeveloped.).